UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NO. 91-189 |
| JAMAL ABU SAMAK | * | SECTION "E" |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

**NOW INTO COURT**, through undersigned counsel, comes defendant Jamal Abu Samak, who respectfully submits this memorandum in support of his motion requesting a sentence reduction and compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

**INTRODUCTION**

Jamal Abu Samak is 64 years old, and he has been in prison for over 29 years. He currently is serving a life sentence that was imposed pre–*Booker*, pursuant to the mandatory Sentencing Guidelines. However, extraordinary and compelling reasons now warrant his release from prison—namely, the serious deterioration of his physical health that has resulted from the aging process and is expected to worsen over time. Additionally, Mr. Samak recently recovered from the COVID-19 virus, which he contracted in his Bureau of Prisons facility, and health experts anticipate that severe, long-term damage may result from that infection—not to mention risk of subsequent infection. Finally, Mr. Samak's record makes it clear that he is not a danger to society, and his release would be consistent with the § 3553(a) factors and overarching sentencing goals. Accordingly, for the reasons discussed below, Mr. Samak respectfully requests that this Court reduce his sentence and order his release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A).

# BACKGROUND[1]

In 1991, Jamal Abu Samak was convicted of conspiring to violate and violating the Organized Crime Control Act of 1970—specifically, 18 U.S.C. § 844(i). The charges in this case arose from an arson conspiracy organized by two of Mr. Samak's co-defendants— Abdel Mousa and Tark Mousa (Abdel's son)—who owned a local grocery store and hired Mr. Samak to burn it down so that they could collect the insurance money. According to the charging document and trial record, Mr. Samak enlisted the help of another individual, Daniel Joseph Lee, who assisted him in setting fire to the grocery store. Tragically, a man who lived in an apartment above the store was killed by the fire. As a result, Mr. Samak faced a maximum statutory penalty of life imprisonment for his crime. *See* § 844(i).[2]

Mr. Samak elected to go to trial on the charges, while each of his three co-defendants pled guilty pursuant to plea agreements with the government. The jury found Mr. Samak guilty. Following the trial, the Court advised the jury that the statute under which Mr. Samak was convicted instructed that he "shall be subject to imprisonment for any term of years or to life imprisonment if the jury shall in its discretion so direct."[3] Accordingly, the Court instructed the jury to deliberate and decide whether Mr. Samak

---

[1] Due to the age of this case, some of the background information discussed in this memorandum is available only in the paper file maintained in the Clerk's Office. It appears that only documents from 2000 or later have been scanned to ECF.

[2] Section 844(i) provides the statutory penalty ranges for anyone who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce[.]" The statute imposes a 20-year maximum for the offense, which increases to 40 years if "personal injury results" and to life imprisonment if death results from the conduct.

[3] *See* 18 U.S.C. § 34 (pre-1994).

2

should be sentenced to life imprisonment. The jury declined to issue that directive to the Court and, instead, selected the alternative option: deferring to the Court to determine an appropriate sentence in accordance with the Sentencing Guidelines. The Court nevertheless imposed a life sentence for Mr. Samak based on the prescription of the Sentencing Guidelines, which were mandatory at the time.

On May 21, 2019, Mr. Samak filed a motion requesting counsel to assist him in seeking compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018. *See* ECF No. 300. The Court subsequently appointed the Federal Public Defender to assist Mr. Samak in determining: (1) whether he has fully exhausted all administrative rights to appeal the Bureau of Prisons's failure to bring a motion on his behalf or whether 30 days have lapsed from the receipt of such a request by the warden of his facility; (2) whether extraordinary and compelling circumstances warrant a reduction of his sentence; or (3) whether he otherwise meets the requirements for compassionate release. ECF No. 305, at 3.

Undersigned counsel filed a motion on Mr. Samak's behalf on May 1, 2020, raising the serious deterioration of Mr. Samak's physical health and his recent battle with a COVID-19 infection as extraordinary and compelling reasons warranting release. *See* ECF No. 308. Finding that Mr. Samak's compassionate release requests in 2017 and 2018 could not satisfy the statutory exhaustion requirement because they could not have been premised on the same information on which the motion relied, the Court denied Mr. Samak's motion without prejudice to refiling "after Petitioner has fully exhausted all administrative rights

3

to appeal a failure of the Bureau of Prisons to bring a motion on Petitioner's behalf or the lapse of 30 days from the receipt of such a request by the warden of Petitioner's facility, whichever is earlier." ECF No. 317, at 3−4.

As discussed below, Mr. Samak now has satisfied the administrative exhaustion requirement. Accordingly, he respectfully requests that this Court grant his motion and reduce his life sentence based on the extraordinary and compelling circumstances related to his serious physical deterioration and medical issues.

## COMPASSIONATE RELEASE REQUEST

Pursuant to 18 U.S.C. § 3582(c)(1)(A), this Court may reduce Mr. Samak's term of imprisonment "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that 'extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"[4] The U.S. Sentencing Guidelines include a policy statement identifying certain circumstances that constitute "extraordinary and compelling reasons" for release under the statute.[5] Among those reasons are:

(1) "The defendant is suffering from a serious physical or medical condition" or is "experiencing deteriorating physical or mental health because of the aging process . . . that substantially diminishes the ability of the defendant to provide

---

[4] *See* 18 U.S.C. § 3582(c)(1)(A).
[5] *See* U.S.S.G. § 1B1.13 (Policy Statement), App. Note 1.

4

self-care within the environment of a correctional facility and from which he or

she is not expected to recover"[6]; or

(2) "The defendant (i) is at least 65 years old; (ii) is experiencing a serious

deterioration in physical or mental health because of the aging process; and (iii)

has served at least 10 years of his prison sentence."[7]

Additionally, the policy statement instructs that "extraordinary and compelling reasons

other than, or in combination with, the reasons described" above can warrant relief under

the statute.[8]

Notably, the Sentencing Commission has not had a quorum to amend its policy

statement since the enactment of the First Step Act, which amended § 3582(c) to allow

defendants to petition the Court for compassionate release themselves after meeting certain

administrative exhaustion requirements. The prior version of the statute only permitted

motions by the Director of the Bureau of Prisons. Accordingly, the plain language of the

Guidelines policy statement remains limited to motions filed by the Director of the Bureau

of Prisons, and the commentary continues to limit extraordinary and compelling reasons

(other than the enumerated list) to those "determined by the Director of the Bureau of

Prisons."[9]  Recognizing this discrepancy, many courts (including this one) have concluded

that the Sentencing Commission "does not have a policy position applicable to motions for

---

[6] U.S.S.G. § 1B1.13, App. Note. 1(A)(ii)(I), (III).
[7] U.S.S.G. § 1B1.13, App. Note 1(B).
[8] *See id.*, App. Note 1(D).
[9] *See* U.S.S.G. § 1B1.13, App. Note 1(D).

compassionate release filed by defendants pursuant to the First Step Act," and, thus, courts have the discretion to determine what constitutes an "extraordinary and compelling reason" on a case-by-case basis, with the policy statement being "helpful, but not dispositive."[10] In other words, this Court's independent assessment of whether extraordinary and compelling circumstances exist is not strictly limited to the reasons enumerated in the policy statement, and the Court has broad authority to decide what should qualify as "extraordinary and compelling" circumstances under the catch-all provision.

## I.    Exhaustion of Administrative Remedies.

As a threshold matter, the compassionate release statute permits a defendant to bring a motion on his own behalf after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[11] Although the Court previously found that Mr. Samak had not satisfied this requirement, he now has.

As reflected in Exhibit A to this memorandum, undersigned counsel and Mr. Samak both submitted requests for compassionate release to the warden of Mr. Samak's facility

---

[10] *See United States v. Perdigao*, No. 07–cr–103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) (Fallon, J.); *see also, e.g.*, *United States v. Beck*, __ F. Supp. 3d __, 2019 WL 2716506, at *5–6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)."); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. June 17, 2019) ("[W]hen a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief.").

[11] § 3582(c)(1)(A).

on May 14, 2020, and May 15, 2020, respectively, and the facility confirmed in writing that the requests were received and in progress.[12] To date, no decision has been received from the warden related to these requests. The administrative requests for compassionate release were based on the same grounds raised in this motion—namely, Mr. Samak's degenerative joint disease and disc disease, osteoarthritis, and multilevel spinal stenosis, which have significantly worsened over the last year, resulting in increasingly severe and frequent pain, stiffness, and numbness, and increasing difficulty engaging in routine, physical movement; his serious deteriorations of his physical health that have resulted from the aging process and are expected to worsen over time, including his prostatism, enlarged prostate, and related urinary tract symptoms, as well as his diagnosis of varicose veins of lower extremities with complications; and his recent, severe illness from COVID-19, which may result in permanent damage and make him more susceptible to severe illness if he contracts COVID-19 again the future. Accordingly, there is no question that Mr. Samak has satisfied the exhaustion requirement in § 3582(c)(1)(A) and that this Court can consider the merits of his motion at this time.

---

[12] BOP's Program Statement governing compassionate release requests indicates that "[t]he Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request." *See* "Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)," BOP Program Statement 5050.50, at 3 (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Out of an abundance of caution, and in light of the frequent lockdowns and communication delays due to the current pandemic, undersigned counsel submitted a request on behalf of Mr. Samak to facilitate prompt consideration and verify receipt of the request. Although undersigned's request was addressed to "Warden Harmon," who undersigned subsequently learned is the *former* warden of USP Atlanta, the facility's legal department confirmed on the phone that the request was properly received.

## II.     Extraordinary and Compelling Circumstances.

Extraordinary and compelling circumstances warrant a reduction of Mr. Samak's sentence and his release from prison. Mr. Samak is 64 years old and has been in prison for over 29 years.[13] As discussed below, he has been experiencing a serious deterioration of his physical health because of the aging process, which has substantially diminished his ability provide self-care in the prison environment, and he is not expected to recover from his conditions. Moreover, Mr. Samak contracted COVID-19 in prison in early April, and he was severely ill for over two weeks. While he has almost recovered from illness, Mr. Samak continues to experience lingering respiratory issues as well as severe pain and nerve issues in his arm resulting from the insertion of needles for IV bags and blood work, for which BOP physicians have scheduled an MRI. What's more, health experts have suggested that the virus may have significant long-term effects on his health and damage to his internal organs. Finally, Mr. Samak's over 25 years of employment with UNICOR, clear disciplinary record, and words of admiration from his factory manager establish that his release is consistent with the § 3553(a) factors and statutory sentencing goals, and that he will not pose a danger to any person or to the community if he is released from prison. Accordingly, Mr. Samak's release from prison is warranted and appropriate under § 3582(c)(1)(A).

---

[13] Mr. Samak was charged with the instant offense on May 3, 1991, and he was remanded following a detention hearing. *See* ECF No. 250 at 6.

A. <u>Mr. Samak is experiencing a serious deterioration in physical health because of the aging process, which is only expected to worsen over time.</u>

Mr. Samak's release is warranted based on his age, the length of time he has been incarcerated, and the serious deterioration in his physical health that he has been experiencing due to aging. As his medical records (attached as Sealed Exhibit C) reflect, he has been suffering from degenerative joint disease that has significantly worsened over the last year, making it increasingly difficult to him engage in routine, physical movement. He also has been suffering from a number of other medical conditions associated with aging, both related and unrelated to his degenerative joint disease. The progression of Mr. Samak's condition has caused increasing pain, stiffness, and numbness in his back and joints, and he is not expected to recover from his degenerative disease or the other age-related medical conditions with which he has been diagnosed.

In January 2019, Mr. Samak was evaluated for bilateral hip pain that had been causing him difficulty with standing, turning, walking, and bending down to put on his shoes and socks for several months.[14] He also was exhibiting a decreased range of motion in his left leg, which was swollen, and medication was largely ineffective in alleviating his symptoms. The clinicians noted tenderness and "painful ambulation," "decreased range of active motion," and "decreased range of passive motion," which they associated with

---

[14] *See* Ex. C at 2–6. As his records indicate, Mr. Samak was already taking an arthritic medication for "attacks of pain in his right thigh" as of December 2018. *See* Ex. C at 1.

localized osteoarthritis. The clinicians also ordered a lumbar spine exam but found no significant changes since the prior exam that was conducted in October 2018.[15]

Mr. Samak returned to the health clinic in February due to his continued joint pain, and in March 2019, he was prescribed twice-daily ibuprofen for his localized osteoarthritis.[16] By July, Mr. Samak again returned to the clinic with worsening right leg pain and weakness that was preventing him from walking easily, and he also reported right scapular pain, right calf pain, right anterior chest wall pain, and elbow pain.[17] Following that visit, his provider increased his ibuprofen dosage "for better pain control" and renewed an analgesic prescription for Mr. Samak to use "for severe pain."[18] Mr. Samak was administered a Lumbar Spine MRI two days later, which resulted in a diagnosis of degenerative disc disease with "worsening pain and neurological symptoms" as well as "multilevel spinal stenosis" and an "associated diagnosis" of lumbar disc disease.[19] Since that time, he has had to return to the health clinic regularly for his chronic back and joint pain, stiffness, and numbness, and he has also exhibited "degenerative changes" in his spine, as indicated in his medical records.[20] Despite being prescribed nerve pain medication, ibuprofen, and other medications, his pain, stiffness, and mobility issues have continued to worsen over time.

---

[15] Ex. C at 7–9.
[16] Ex. C at 10–12, 24–25.
[17] Ex. C at 38.
[18] Ex. C at 40.
[19] Ex. C at 41–42.
[20] *See* Ex. C at 46–47, 48–49, 53, 64–67, 74–75, 76.

Mr. Samak's degenerative condition is the result of aging, and he is not expected to recover. On the contrary, his diagnoses mean that he will likely continue to experience increased pain and difficulty with routine movement over time. Degenerative disc disease is a form of arthritis in which "the cartilage in the spine joints begins to wear out."[21] The condition "often increases with increasing maturity for no reason that can be identified."[22] Degenerative joint disease cannot be reversed, and aside from surgical intervention or spinal injections, the only treatment is pain management, such as through medication, physical therapy, and back braces.[23]

Mr. Samak's related diagnosis of multilevel spinal stenosis indicates "a narrowing of the spaces within [his] spine, which can put pressure on the nerves and travel through the spine."[24] Consistent with Mr. Samak's medical records, spinal stenosis can cause "pain, tingling, numbness and muscle weakness."[25] And, as with degenerative disc disease, symptoms can worsen over time.[26] Moreover, if improperly treated, severe spinal stenosis

---

[21] *See* "Degenerative Disc Disease," Johns Hopkins Medicine (accessed Apr. 30, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/degenerative-disc-disease.

[22] *Id.*

[23] *See, e.g.*, "Degenerative Disc Disease," Cedars Sinai (accessed Apr. 30, 2020), https://www.cedars-sinai.org/health-library/diseases-and-conditions/d/degenerative-disc-disease.html; "Degenerative Disc Disease (spondylosis)," Mayfield Brain & Spine Clinic (Sept. 2018), http://www.mayfieldclinic.com/pe-ddd.htm.

[24] *See* "Spinal Stenosis," Mayo Clinic (Mar. 8, 2018), https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961.

[25] *Id.*

[26] *Id.*

can progress and lead to permanent numbness, weakness, balance problems, incontinence, or even paralysis.[27]

In addition to his degenerative joint disease and associated diagnoses, Mr. Samak has been suffering from other progressive, age-related conditions over the last year. For example, in March 2019, he was prescribed daily medication for an enlarged prostate with lower urinary tract symptoms—a condition that is associated with aging in men.[28] According to his medical records, he had been on medication for prostatism (*i.e.*, an obstruction associated with an enlarged prostate gland) since before December 2018.[29] The symptoms associated with this condition—*e.g.*, frequent or urgent need to urinate, increased frequency of urination at night, difficulty starting urination, and inability to completely empty the bladder—"tend to gradually worsen over time."[30] Urinary tract infections are considered a complication of the condition that can require surgery if they become frequent.[31] Other complications of the condition include the "sudden inability to urinate" requiring a catheter; bladder stones that can cause infection, irritation, or obstruction; bladder damager; and kidney damage that can pose a serious health threat.[32]

---

[27] *Id.*
[28] *See* Ex. C at 25; *see also* "Benign prostatic hyperplasia (BPH)," Mayo Clinic (Mar. 2, 2019), https://www.mayoclinic.org/diseases-conditions/benign-prostatic-hyperplasia/symptoms-causes/syc-20370087.
[29] Ex. C at 1.
[30] *See supra* note 27.
[31] *Id.*
[32] *Id.*

Mr. Samak also was diagnosed in March 2019 with "varicose veins of lower extremities with complications"—yet another condition caused by aging.[33] Varicose veins are "twisted, enlarged veins" that "can cause aching pain and discomfort" and can sometimes "lead to more serious problems."[34] This condition "normally gets worse over time," and the primary management techniques involve self-care measures and lifestyle changes, such as physical activity and compression therapy.[35] Although rare, complications associated with varicose veins include painful ulcers on the skin, blood clots in the leg that can be identified by persistent leg pain or swelling, and bleeding from a burst vein.[36]

Thus, as evidenced by Mr. Samak's medical records, he is experiencing a serious deterioration of physical health because of the aging process from which he is not expected to recover.[37] His conditions have substantially diminished his ability to provide self-care in the prison environment. Indeed, he has had to visit the facility's health services with increasing frequency due to pain, stiffness, and immobility issues, and he continues to take 800 mg of ibuprofen three times a day (the equivalent of 12 regular Advil per day) for pain

---

[33] *See* Ex. C at 25; *see also* Amber Erickson Gabbey, "Varicose Veins: Causes of varicose veins," Healthline (Mar. 30, 2017), https://www.healthline.com/health/varicose-veins#causes.

[34] *See* "Varicose Veins," Mayo Clinic (Jan. 16, 2019), https://www.mayoclinic.org/diseases-conditions/varicose-veins/symptoms-causes/syc-20350643.

[35] *See* "Varicose Veins," NIH Nat'l Heart, Lung, and Blood Institute (accessed Apr. 30, 2020), https://www.nhlbi.nih.gov/health-topics/varicose-veins; *see also* "Varicose Veins: Treating and preventing varicose veins," Healthline (Mar. 30, 2017), https://www.healthline.com/health/varicose-veins#treatment-and-prevention.

[36] *See supra* note 33.

[37] Mr. Samak also has faced a number of other medical issues over the last year, including high blood pressure, hyperlipidemia, obesity, high cholesterol, eye issues, and a systolic murmur. *See, e.g.*, Ex. C at 14, 21–22, 24–25, 26–31, 35–36, 44–45, 56–63, 73.

management, in addition to his other medications. Notably, he also is 64 years old—only one year shy of the circumstance in the Guidelines policy statement that permits release based on a serious deteriorating of physical health due to the aging process, regardless of its effect on a person's ability to provide self-care. Accordingly, Mr. Samak's release is supported by both of those instructive (but non-binding) circumstances in the Guidelines policy statement.

B. Mr. Samak is recovering from severe illness after contracting COVID–19 in prison, and the virus is likely to have significant long-term effects on his health.

As the Court is aware, the recent spread of the Coronavirus (COVID–19) has caused the President to declare a national emergency and has resulted in the shutdown of businesses, schools, and courthouses across the country. As of this filing, the virus has infected at least 2,063,812 people in the United States, resulting in at least 115,271 deaths.[38] And, consistent with the warnings of health experts, the Bureau of Prisons facilities have become rapidly growing hotspots for COVID–19 outbreaks.[39] As of this filing, BOP is

---

[38] Cases of Coronavirus Disease (COVID-19) in the U.S., Center for Disease Control and Prevention, (June 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. These numbers have essentially doubled since Mr. Samak filed his previous motion on May 1, 2020. *See* ECF No. 308-1 at 13 n.37.

[39] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):1047-1055 (2007), https://doi.org/10.1086/521910 ("The probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, insufficient infection-control expertise, and prohibitions against the use of proven harm-reduction tools[.]"); "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), https://bit.ly/2W9V6oS (warning that incarcerated individuals "are at special risk of infection, given their living situations," that they "may also be less able to participate in proactive measures to keep themselves safe," and that "infection control is challenging in these settings").

reporting that over 6,100 federal inmates and over 650 staff members have tested positive for COVID-19—including both active cases and those who have recovered—with BOP attributing 84 inmate deaths and 1 staff member death to the disease.[40]

On April 7, 2020, Mr. Samak tested positive for the COVID-19 virus after a clinical examination resulted in "findings [that were] concerning for multifocal pneumonia" but were limited "due to small lung volumes with bronchovascular crowding."[41] He was extremely ill and spent three days in an outside hospital, experiencing fever, shortness of breath, coughing, and loss of taste. The Bureau of Prisons provided him with acetaminophen as well as an Albuterol inhaler to use every six hours as needed. While Mr. Samak is no longer hospitalized, he continues to experience lingering coughing and throat soreness today, two months later. Additionally, Mr. Samak recently informed undersigned counsel that he has been suffering from severe pain in his left arm where needles were inserted to take his blood and administer IV bags during his illness. According to Mr. Samak, he cannot move his arm or shoulder, and his doctor advised him that he has been scheduled for an MRI.[42]

Mr. Samak's COVID-19 diagnosis constitutes another serious medical condition warranting his release from prison, as he is unlikely to ever fully recover from the effects of the virus on his body.  In addition to his continued symptoms and the collateral effects

---

[40] COVID-19 Cases, Bureau of Prisons (June 15, 2020), https://www.bop.gov/coronavirus/.

[41] *See* Sealed Exhibit D (medical records from COVID–19 treatment).

[42] Undersigned is attempting to obtain copies of Mr. Samak's medical records from the last six weeks related to these updates.

and pain resulting from his treatment, experts have suggested that a severe case of the virus may lead to permanent organ damage, lung scarring, and neurological issues, among other possible long-term complications. Dr. Khalilah Gates, a pulmonologist and assistant professor of pulmonary critical care and medical education at Northwestern University, has said that the increased inflammatory responses caused by COVID-19 can harm critical organs like the kidneys, lungs, and heart.[43] This can lead to "irreversible scarring [of the lungs] (fibrosis) that can greatly impact lung function long term."[44] Furthermore, Yale cardiologist Dr. Harlan Krumholz has explained that many people who are recovering from COVID-19 have damage to the heart, which he believes will persist even after the patients have fully recovered. Importantly, a recent article explained that "the most notable potential long-term impacts that are already showing up in some COVID-19 patients" have included lung scarring and reduced lung capacity, abnormal blood clotting that can cause strokes, lung blockages, and heart attacks, cardiac damage leading to heart failure, and a slew of neurological issues.[45] Additionally, the World Health Organization recently stated that there currently is no evidence that people who have recovered from COVID-19 are protected

---

[43] *See* Julia Riles, *The Long-Term Effects Coronavirus May Have On The Body*, Huffington Post, (Apr. 24, 2020), https://www.huffpost.com/entry/coronavirus-long-term-effects-on-the-body_l_5e9a0017c5b6ea335d5b3cf3.

[44] *Id.*

[45] *See* Lois Parshley, *The emerging long-term complications of Covid-19, explained*, Vox (June 12, 2020), https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms; *see also What we know (so far) about the long-term health effects of Covid-19*, Advisory Board (June 2, 2020), https://www.advisory.com/daily-briefing/2020/06/02/covid-health-effects.

from a second infection.[46] Katrina Pollock, a senior clinical research fellow in vaccinology at the NIHR Clinical Research Facility at Imperial College London, stated that "it is sometimes the case where if you have a strong reaction you might have immunity persist for longer but it might also be the case that those people are not able to respond to infections as easily."[47]

Importantly, Mr. Samak experienced multiple respiratory issues last year, prior to the COVID-19 pandemic. In February, he was evaluated for cold symptoms including a persistent cough and chronic shortness of breath, which he reported experiencing for months prior to his visit.[48] A month later, he continued to experience chronic cough with phlegm and reported having a fever, and he was prescribed antibiotics to treat an acute lower respiratory infection.[49] Now, two months after his illness, he has continued to experience lingering respiratory symptoms which could be indicative of more severe, long-term complications, not to mention the possibility of other long-term damage and effects that have not yet manifested but would substantially diminish his ability to provide self-care in the prison environment. Accordingly, Mr. Samak's age, history of respiratory issues and other physical ailments, and critical illness from COVID-19, as well as the threat

---

[46] *"Immunity passports" in the context of COVID-19*, World Health Organization (Apr. 24, 2020), https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19.
[47] *See* William Park, *Can you catch Covid-19 twice?*, BBC, (Apr. 22, 2020), https://www.bbc.com/future/article/20200421-will-we-ever-be-immune-to-covid-19.
[48] Ex. C at 10–11.
[49] Ex. C at 17.

of severe illness if he were to contract the virus a second time in prison, constitute additional extraordinary and compelling circumstances warranting his release.

### III.   Consideration of the § 3553(a) Factors.

Finally, Mr. Samak's release is supported by § 3553(a), and he will not pose a danger to the safety of others or the community if he is released. As Mr. Samak's records reflect, he has been a model inmate throughout his nearly 30 years of incarceration. He has spent over 25 years working full-time as an employee for UNICOR, and during that time, he has maintained "outstanding performance evaluations," "perfect attendance," a "clean disciplinary record," and "a great level of reliability and personal discipline."[50] Mr. Samak's Factory Manager, Lizette Quiles, describes him as a "reliable worker" who has even been hired in the past as part of an "overtime team" used "to fulfill customer demands." According to Ms. Quiles, Mr. Samak "communicates very well with peers and staff," "is very respectful towards other inmates and staff," and she has found his "performance, reliability, professionalism, and work ethic . . . commendable."

It is clear from Mr. Samak's decades of incarceration that the time he has spent in prison has been more than sufficient to promote respect for the law, deter him from future criminal conduct, protect the public, and provide him with vocational training and correctional treatment in the most effective manner. Indeed, as Ms. Quiles noted, Mr. Samak has received multiple program certifications through his work with UNICOR

---

[50] *See* Exhibit B, consisting of two letters from Mr. Samak's factory manager from 2014 and 2020, as well as a copy of his inmate progress report.

and has held the positions of Textile Sewer for military clothes as well as Quality Inspector in multiple UNICOR Textiles Manufacturing Factories. And, as previously mentioned, Mr. Samak has achieved these accomplishments and earned the admiration and respect of his supervisors while maintaining a perfectly clean disciplinary record.

There is no question that Mr. Samak committed a serious crime with tragic consequences in this case, but his conduct in this case clearly reflects an aberration in his entire 64 years of life, and his conduct over the last 25 years is a much better indicator of the person he is today. Thus, the totality of the circumstances in this case—and the three intervening decades—demonstrate that his current life sentence is "greater than necessary" to comply with the goals of sentencing. A sentence reduction also would be consistent with the need to avoid unwarranted sentence disparities among similarly situated defendants. Indeed, as previously mentioned, Mr. Samak's three co-defendants pled guilty to their involvement in this conspiracy, while Mr. Samak exercised his right to go to trial. While Mr. Samak was sentenced to life imprisonment, the two individuals who organized the conspiracy and hired him to commit the arson were sentenced to 5 years and 10 years of imprisonment. And Mr. Samak's third co-defendant, who admitted to helping set the fire that killed the victim, was sentenced to 188 months and was released from prison over 15 years ago, on November 26, 2004.[51] Thus, even if Mr. Samak were released today, he

---

[51] *See* ECF No. 250 at 16; *see also* BOP Inmate Locator (Daniel Joseph Lee, Reg. No. 22245-034), https://www.bop.gov/inmateloc/.

will have served nearly 16 years longer than the most recently released co-defendant—by far the longest of anyone involved in this scheme.

## CONCLUSION

For all of the reasons discussed above, Mr. Samak's release from prison is warranted under § 3582(c)(1)(A) and is consistent with § 3553(a). He has been in prison since his mid-30s, and at the age of 64, he is experiencing serious deteriorations in his physical health that will only continue to progress, as well as lingering effects of his COVID-19 infection that may also result in permanent damage and long-term medical complications. Despite his medical issues, Mr. Samak has been a model inmate during his 29 years in prison, working full-time for UNICOR while maintaining a clean disciplinary record. Thus, the totality of the circumstances in this case establish that his time in prison has been sufficient to satisfy the sentencing goals, and his further incarceration is unnecessary to achieve those ends. Finally, given his current age and physical condition, as well as the lack of a pattern of violent activity in his history and his extraordinary post-sentencing conduct over the last 29 years, Mr. Samak clearly does not pose a danger to any person or the community if he is released today.[52]

---

[52] It is worth noting that Mr. Samak's immigration status is uncertain, and it is unclear whether he would have an opportunity to remain in the United States following his release. Mr. Samak was born in Israel, originally came to the United States on a visa, and was classified as a permanent resident at the time of this crime. Mr. Samak's nephew advised undersigned that he has been in communication with immigration attorneys to determine next steps if Mr. Samak is released, and Mr. Samak is prepared to face any immigration consequences of his release, including deportation if that is the ultimate result.

**WHEREFORE**, for the foregoing reasons, Jamal Abu Samak respectfully requests that the Court grant his motion and order his release pursuant to § 3582(c)(1)(A).

Respectfully submitted this 15th day of June, 2020.

CLAUDE J. KELLY
Federal Public Defender

/s/ Samantha Kuhn
SAMANTHA J. KUHN
Assistant Federal Public Defender
Hale Boggs Federal Building
500 Poydras Street, Suite 318
New Orleans, Louisiana  70130
Telephone:  (504) 589-7930
TX Bar No. 24083333

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following: Assistant United States Attorneys Chandra Menon and Diane Hollenshead Copes, 650 Poydras Street, New Orleans, Louisiana 70130.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

/s/ Samantha Kuhn
SAMANTHA J. KUHN
Assistant Federal Public Defender